# Walker *v*. The State.

## *Indictment for Murder.*

1. *Relevancy of evidence showing feelings of deceased towards accused.*—Where the deceased was slain by the accused in a personal combat in the dark, both being freedmen, and no witness being present; and it was shown that the accused had been living in a state of fornication with the daughter of the deceased, but had just married her, and the fact of the marriage had just been communicated to the deceased, who had made threats against the accused if he did not marry her; *held*, that the accused should be allowed to prove, in rebuttal, that the deceased was in fact opposed to his marriage with the girl, and was himself living in adultery with her, although she was his daughter.

FROM the Circuit Court of Tuskaloosa.

Tried before the Hon. WM. S. MUDD.

The prisoner in this case, who was a freedman, was indicted for the murder of Tom Isham, who was also a freedman; and on his trial he reserved the following bill of exceptions, on which the case is brought to this court, to-wit: "The State introduced several witnesses, whose testimony tended to prove that, on the night of the 2d April, 1878, in the county of Tuskaloosa, Tom Isham, a colored man, was killed by the defendant, under the following circumstances: The defendant, about 9 o'clock P. M., had just been married to a negro girl named Keziah, who was the daughter of the deceased, at a house situated about four or five hundred yards from the house of the deceased; and the married couple rode on horseback, in the direction of the defendant's house. They stopped in the public road, about fifty or seventy-five yards from the house, and the girl went in to get her clothes, after which she returned; whereupon, the deceased, on learning the fact of her marriage, came out of his cabin, and went in the direction of the defendant, crossing the fence. Words ensued, which indicated that a combat was progressing in the dark; and the said Tom Isham was killed in the rencontrue, being stabbed in the throat with a knife, apparently a large pocket-knife. A chestnut rail was found in the road, partially broken about four feet from one end, and similar to the rails on the fence near the gap at which the deceased probably crossed in going towards the defendant. The evidence tending to show who used the rail, whether the defendant or the deceased, was conflicting; but facts were in proof, tending to show that it might have been either the one or the other. Some violent threats, on several occasions,

were proved to have been made by defendant against the deceased, and they were shown to have been previously very unfriendly, if not hostile to each other. The State introduced evidence to show that, about two days before the killing, threats had been made by the deceased to have the defendant arrested for living in adultery with, and otherwise maltreating said Keziah (his daughter); and that a quarrel, or difficulty, had taken place between them about the matter; and that the deceased insisted on defendant marrying her; and that defendant said, on one occasion, that he would marry her and put an end to this 'fuss and growling.' The defendant offered evidence tending to show that the said Tom Isham was, and had been, living in adultery with the said Keziah, and was opposed to her marrying defendant; and the purpose of this evidence was to show a jealousy on the part of the deceased against defendant, on account of said marriage. The solicitor for the State objected to this evidence, and the court sustained the objection, and excluded the evidence; to which the defendant excepted. This was all the evidence."

H. M. SOMERVILLE, and S. A. M. WOOD, for defendant.

H. C. TOMPKINS, Attorney-General, for the State.

MANNING, J.—The conflict between appellant and Tom Isham, whom he slew, occurred at night; and no one appears to have been able to explain how it began. They were both negroes, and their quarrel seemed to have grown out of their relations with Keziah, a daughter of Tom, with whom appellant, defendant in the Circuit Court, had been living in illicit intercourse, and whom he had married at a house four or five hundred yards distant from that in which Tom Isham lived, just before the fatal rencontre between the two men took place. Defendant and Keziah were, it seems, on their way from the house where they had been married, to some other place, to which they were going on horseback; and passing along the road by Tom's house, they stopped at, and Keziah entered it, to get her clothes; and when she came out, after having, perhaps, told her father of the marriage, he came out also, and crossing a fence around his house, "went in the direction of defendant." "Words ensued which indicated that a combat was progressing in the dark." Tom was killed, "being stabbed in the throat by a knife." A broken rail, also, was found near the spot; but "the evidence tending to show who used the rail, whether defendant or deceased, was conflicting."

Evidence, on the part of the State, tended to show that two days before that time, deceased had threatened to have defendant "arrested for living in adultery with and otherwise maltreating the said Keziah (his daughter), . . . and had insisted on defendant marrying her, and that defendant had said, on one occasion, that he would marry her and put an end to this 'fuss and growling.'"

In defense, testimony was offered "tending to show that the said Tom Isham was, and had been, living in adultery with said Keziah" (his daughter), "and was opposed to her marrying defendant," the purpose being to produce the belief that he was moved by jealousy on account of the marriage.

We think that, under the circumstances, this evidence should have been admitted. The testimony for the State tended to show, on the part of deceased, a natural and just indignation at the disgrace brought by defendant upon his daughter, and a desire that reparation for it should be made by their marriage; which having been effected, the jury might infer that the feelings with which deceased went to defendant were probably friendly, instead of hostile, and that the conflict, therefore, was brought on by defendant, in pursuance of the threats which, according to the evidence, he had previously made, and to gratify the animosity he had before expressed. The deliberations of the jury in this matter ought to have been made with correct information of all the facts relating to it. As the State's witnesses had testified that deceased desired and insisted on the marriage, which had taken place, defendant should have been permitted to prove to the contrary, that deceased was opposed to, and exasperated by it, and the reason why, if such was the fact. It was almost immediately after that event, apparently as a consequence of it, and when deceased first heard of it, that the conflict in the dark took place. And it not having been seen by any witness who testified, how it was brought on, all the facts and circumstances connected with and leading up to the rencontre in which Tom was slain, should have been submitted to the jury, for the purpose of enabling them to determine correctly the degree and nature of defendant's responsibility.

We do not mean to intimate that, if the testimony excluded had been submitted to the jury, they ought to have been influenced by it to bring in a verdict less severe. It is for them alone, upon a consideration of all the evidence, according to the law, to be explained to them by the presiding judge, to determine the degree of defendant's guilt; and we think the excluded testimony tended to prove facts so bear-

ing upon the transaction and relevant to the case, as to entitle defendant to be allowed to submit it to the jury.

Let the judgment be reversed, and the cause be remanded, and the defendant remain in custody until discharged by due course of law.